### FORT ORANGE OIL CO. v. JOHN F. WICHMAN.

1. WRITTEN PORTIONS OF A CONTRACT WILL CONTROL THE PRINTED PORTIONS.

   In cases of ambiguity or inconsistency between the written and printed parts of a contract (a blank form having been used), the written parts will control.

2. PROVISION AS TO PAYMENT OF LOCATION MONEY—HOW CONSTRUED.

   Where the owner of certain lands executes an oil and gas lease, which contains a provision requiring the lessee or his assigns, operating under this lease to pay "$150 for each location when the location is made" of certain oil wells to be drilled by the lessee or his assigns under this lease, and said lease specifying for the location and drilling of only four wells: *Held*, that by the provisions of this lease, the lessee or his assigns shall pay this location money on the four wells only which are specifically required to be drilled under it, and not for any other wells that may be drilled in addition to these four wells.

3. ATTITUDE AND OBJECT OF PARTIES ENTERING INTO CONTRACTS CALLED "OIL LEASES."

   It is the attitude and object of parties entering into contracts called "oil leases" to have the lease so framed as not to place any obstacles in the way of drilling additional wells beyond the number specifically provided for in the lease.

4. MEANING OF WORD "WELLS."

   The words, "wells to be located by both parties" appearing in the written clause of the lease, is held to mean that the word "wells" does not apply to all wells, but that the right of the lessor to participate in the location of wells applies to the four wells only.

5. DRILLING OF ADDITIONAL WELLS.

   The location of the four wells as specifically provided for in the lease having been accomplished, the drilling of additional wells became optional with the lessee.

6. INTERPRETATION OF CLAUSE RELATING TO THE DRILLING OF WELLS WITHIN 300 FEET OF CERTAIN BUILDINGS.

   The clause in the lease providing that, "no well shall be drilled nearer than 300 feet to the house or barn on said premises," etc., is not intended as a limitation upon the right of the lessor to have wells drilled at one place on his premises, but is intended as a restriction upon the right of the lessee to drill upon the premises. This provision, taken in connection with that as to the location of wells, indicates clearly the intention of the parties that both should agree upon the location of the four required wells, but that the lessee alone should determine the location of any additional wells, subject to the restriction that they should not be located nearer the building than 300 feet.

7. MEANING OF CLAUSE RELATING TO THE PROTECTION OF THE LINES.

   The clause in the lease providing that the "second party (the lessee) is also to protect the lines," is held to mean that if necessary to the protection of this tract of land, in order that the lessor may receive his share of the oil supposed to be underlying the district of which it is a part, the lessee shall drill additional wells.

ERROR to the Court of Common Pleas of Lucas county.

PARKER, J.

On January 3, 1893, the defendant in error, being the owner of certain lands in Sandusky county, executed what is commonly termed an oil and gas lease, upon the same, the grantee or lessee, therein named, being his son John H. Wichman. Certain rights and privileges are thereby conferred upon John H. Wichman, his heirs, successors, and assigns. This instrument contains a provision requiring the lessee, or his assigns operating under this lease, to pay $150 for each location of

Fort Orange Oil Co. v. Wichman.

certain oil wells, to be drilled by the lessee or assigns under this instrument. The question presented for consideration in the court below, and here, is whether this lease requires that the lessee, or, assigns shall pay this location money on four wells which are required to be drilled under it, only, or upon any other wells that may be drilled in addition to the four.

It appears that, by certain assignments, the Fort Orange Oil Co. came to be the owner of this lease, and vested with the rights of the lessee; that before it became the owner, the four required wells had been drilled upon the premises, and the location money had been paid on account of those four wells. Since the Fort Orange Oil Co. has come to be the owner of the lease, it has drilled nine additional wells. The action was instituted for recovery on account of ten wells, but it developed upon trial that if there was any liability for any wells in addition to the four, it was for nine only.

As appears from the bill of exceptions, upon the trial of the case the parties agreed upon the following facts:

"It is agreed by and between the parties hereto that since the assignment of said lease to the defendant, it has located and drilled nine wells on said premises, one of which produces absolutely no oil, three were light wells and were operated for a very short time only, five were fair wells and have been regularly operated. That the defendant has also erected machinery over and cleaned out one old well drilled on said premises by the Paragon Oil Co. before the date of said lease, which well has also been operated by defendant. It is further stipulated that nothing herein contained shall prevent the parties from offering further proof subject to the usual objections and exceptions."

And upon the theory that there was some ambiguity in the lease with reference to the matter in dispute, the court admitted oral proof of additional facts, in order that the court might be in possession of the facts and circumstances surrounding the parties at the time this lease was made, and in order that the court might be advised as to the construction the parties themselves had, by their conduct, put upon the lease with reference to this matter.

The trial resulted in a finding and judgment in favor of the plaintiff below and against the defendant below for $150 on account of each of these nine wells, making a total of $1,350 and interest.

Our attention has been called to and we have carefully considered the opinion of the learned judge of the lower court. He seems to have devoted to this question considerable thought and attention, and his opinion is certainly entitled to great respect. I therefore regret, since the duty has fallen upon me to announce this opinion, that I have not had an opportunity to formulate my ideas and reduce them to writing, in order that I might present our thoughts upon the subject with more care and clearness, and perhaps with more force, since we find ourselves unable to agree with his conclusions.

The lease in question reads as follows:

"In consideration of the sum of (one) dollar, the receipt of which is hereby acknowledged, (John F. Wichman of Sandusky county, Ohio,) first party, hereby grant unto (John H. Wichman), second party, its successors and assigns, all the oil and gas in and under the following described premises, together with the right to enter thereon at all times for the purposes of drilling and operating for oil, gas, or water, to erect and maintain all buildings and structures, and lay all pipes necessary for the

production and transportation of oil, gas or water, taken from the said premises, excepting and reserving, however, to first party the (one-sixth) part of all oil produced and saved from said premises, to be delivered in the pipe line with which said second party may connect its wells, namely, all that certain lot of land situated in the township of (Madison) county of (Sandusky), in the state of (Ohio), bounded and described as follows, to-wit: (Then follows a description of a tract of 90 acres.) To have and to hold the above premises on the following conditions: If gas only is found, second party agrees to pay (three hundred) dollars each year for the product of each well, while the same is being used off the premises, and the second party to have gas free of cost to heat (all) stoves in dwelling house during the same time. Whenever first party shall request it, second party shall bury all oil and gas lines (below plow depth), and pay all damages to growing crops by reason of burying and removing said pine lines. No well shall be drilled nearer than (300) feet to the house or barn on said premises, and no well shall occupy more than one acre. In case no well is completed within (60) days from this date, then this grant shall become null and void. The second party shall have the right to use sufficient gas, oil or water, to run all necessary machinery for operating said wells and also the right to remove all its property at any time. (A second well to be drilled within four months, a third well within eight months, a fourth well within 12 months from date of lease, second party to pay $150 for each location when the location is made, wells to be located by both parties. If wells are not drilled as stated second party only to hold 15 acres for each well so drilled. Second party is also to protect the lines. Steam lines to be laid north, south, east and west.) It is understood between the parties to this agreement that all conditions between the parties hereunto shall extend to their heirs, executors, and assigns.

"In witness whereof the parties hereto have set their hands and seals this (23rd) day of (January,) A. D., 189(3.)"

It is signed by the parties, witnessed, and acknowledged in due form as required by law. For convenience in arriving at a better understanding of the question, the stenographer may enclose in brackets the written portion of so much as I shall read.

It will be observed that the language is not in all respects grammatical—that the construction is not grammatical. That arises largely, but not entirely, out of the fact that a printed blank is used, and care does not seem to have been exercised to make such slight alterations as would be required to make the instrument read grammatically. In the provision "the second party shall have the right to use sufficient gas, oil or water to run all necessary machinery for operating said wells and also the right to remove all its property at any time." While this sentence is grammatical in form, yet it will be observed that up to that point in the lease there had been no wells referred to that could have been properly described as "said wells," the only well therefore referred to specifically being the one well which the lessees were required to complete within a period of sixty days. This seems to have arisen from the circumstance of the use of a printed blank, and a lack of care to make the written and printed portions entirely conformable the one to the other. Similar inconsistencies are doubtless due to the same causes. Following the sentence which I have just read comes a part of the lease which is written, and with respect to which this controversy and difference of opinion arises:

"A second well to be drilled within four months, a third well within eight months, and a fourth well within 12 months from date of lease; second party to pay $150 for each location when location is made, wells to be located by both parties. If wells are not drilled as stated, second party only to hold 15 acres for each well so drilled. Second party is also to protect the lines. Steam lines to be laid north, south, east and west."

Then following the provisions which is printed in the form, beginning with the words "It is understood between the parties," etc. The question turns upon the construction to be given especially to this written part of the lease, and more especially to these words: "Said party to pay $150 for each location when location is made." We are to determine whether those words are to refer to all wells that may be drilled under this lease, or whether they refer to the wells the drilling of which is required under the lease. It will be observed that there is no requirement to drill more than four wells. With reference to the four wells the lease contains a provision that in the event that the first is not drilled within sixty days from date, the grant shall become null and void. If the four are not drilled, the first having been drilled, then the lessee is to hold on account of each well drilled less than the full number of four but fifteen acres of the ninety.

In construing this lease we apply the well settled rule, in cases of ambiguity or inconsistency between written and printed parts of a contract (a printed blank form having been used), the written parts will control.

In our judgment, the provision as to the payment of $150 on account of each location, applies to the four wells only. We are brought to this conclusion not only from a consideration of the language as we find it in the lease, but from a consideration of the fact that this part of the lease is written, while other provisions, referring generally to wells that are not required to be drilled but may be drilled, are printed and form a consideration of the facts and circumstances surrounding the parties, and the results to be accomplished by the parties, that would naturally be affected by the provisions respecting this location money. We are not aided a great deal by the oral testimony as to the conduct of the parties to this lease after the time that the Fort Orange Oil Co. came to be the owner thereof. It may be said, however, that the testimony does tend to show that the lessor did not seem to regard his right to recover location money on account of any wells in addition to the four as being clear. At all events, he did not proceed with promptness to assert his right to such location money. According to his own testimony he took some part in the location of the wells first drilled upon the premises by the Fort Orange Oil Co., and upon the occasions when those locations were made he did not assert any right to this location money or make any demand for it, those being the times it became due and payable, if at all. It appears, however, that after a well which is designated as No. 7 was drilled, he made a demand for location money on account of the wells previously drilled. This is disputed by an officer of the Fort Orange Oil Co. upon whom plaintiff claims he made this demand. But assuming that he did make the demand at the time and place and in the manner stated, it was not made at the time or place that one believing that he had a clear right to receive this location money would have made the demand, viz.: Upon the premises at the time the location was made, he himself being present and assisting in making the location. This demand, assuming that it was made, does not appear to have been followed

by any other demand or any other effort to collect this location money, until after the nine wells were completed. Then his claim appears 'to have been made with some promptness and vigor, resulting in this suit. As I say, we do not give a great deal of weight to that, but we give more to the considerations that must have influenced the parties to the contract when fixing its terms. A large number of actions have been brought before this court involving the rights of lessors and lessees under leases of this character, and the lessee has always been urgent for the drilling of more wells and with greater promptness and rapidity than the lessee has been willing to concede his right to have or·demand. The interest of the lessor seem to he subserved, according to the opinions of lessors generally, by the drilling of a great many wells and the drilling of those wells promptly,' so that the lessor might receive from the leased premises at as early a date as possible, his share of the oil, generally one-sixth. The cost of drilling and operating the wells falls upon the lessee. He is therefore found reluctant and sometimes tardy in the prosecution of this work, generally desiring that he may be relieved from the drilling of a great many wells, or from pushing the prosecution of this work, so that he may be saved the expense of putting down many wells, and operating them, and may secure the oil that he is entitled to under his lease from a few wells rather than from a great many. In the case at bar, the interest of the lessor would dictate that no obstacle should be placed in the way of drilling additional wells other than the four the drilling of which he has specifically required. His interest would not be injured, but would be promoted by the rapid drilling of additional wells. Therefore we cannot conceive that under such circumstances the lessor would desire or intend that the lease should be so framed as to place obstacles in the way of drilling additional wells. It is apparent that he would desire to remove all such obstacles. So many cases have come before us indicating that this is the attitude and these the objects of parties upon entering into these contracts called "oil leases," that we cannot ignore the knowledge thus acquired, if we take into consideration the case here represented only.

In order that the lessee may secure the right to all the oil underlying the whole premises he is required to drill four wells. If he drills a less number than four, he fails to obtain this right as to some part of the land, i. e., upon the drilling of one well he acquires a right to the soil underlying 15 acres; upon the drilling of the second well he acquires a right to the oil underlying 15 acres more: the third well gives the right to 15 acres more, making 45 acres; and upon the drilling of the fourth well the lessee's right to the remainder of 35 acres (in all 90 acres) is established. It is seen, therefore, that by these provisions whereby the right of the lessee to drill upon and obtain the oil underlying the premises, is made to depend upon the drilling of these wells, an inducement is offered for the drilling of such wells, and the payment of the location money of $150 for each well; so that the lessor has some assurance that the wells will be drilled, and he will obtain this location money. If the wells are not drilled, his land, or part thereof, as heretofore pointed out, remains unaffected by the lease, and he is at liberty to lease to another or drill upon it on his own account. But, as before indicated, there is no such inducement to the drilling of additional wells. The lessee may, if he chooses (laying aside for the moment the provision as to protecting the lines), cease from drilling, and depend upon the operation of the four required wells for the production of the oil underlying the premises.

No disadvantage can result to the lessor from the drilling of additional wells, but only advantage. Therefore the lessor would not be inclined to impose what might be regarded as a penalty upon the lessee, if he should seek to sink additional wells. We feel bound to believe that the parties had these considerations in mind when they drafted the lease.

It is urged in argument that the words "wells to be located by both parties," appearing in the written clause, applies to all wells that may be drilled, and that since it is a part of the same clause and sentence as that containing the provision as to location money, it throws light upon the latter, and clearly indicates that it also applies to all wells. We do not agree with the contention of counsel that the word "wells" as here used applies to all wells. We are of the opinion that the right of the lessor to participate in the location of wells applies to the four wells only. Since a part of his land is to be held and operated on account of each of these wells, i. e., 15 acres for each of the first three and 35 acres for the fourth, and since the tracts thus to be held are not distinctly marked out or defined, but would naturally be held to be tracts contiguous to the wells drilled on account thereof, the lessor would have a special interest in the location of these wells. He would also have a special interest therein growing out of the fact that the lessee might drill a less number than four, or, at all events, not more than four, and the lessor would naturally desire to have the required wells so located as to develop as much as possible of his land. This having been accomplished, and the drilling of additional wells being optional with the lessee, who has become the owner of all the oil underlying the whole premises (less the royalty), the same consideration that would impel the lessor to forego any claim for additional location money would impel him to refrain from interfering with the lessee in his further operation upon the premises. Again, we find in the lease this provision: "No well shall be drilled nearer than 300 feet to the house or barn on said premises," etc. It is clear that this is not intended as a limitation upon the right of the lessor to have wells drilled at one place on his premises, but is intended as a restriction upon the right of the lessee to drill upon the premises. Now if the lessor has a right to participate in the location of all wells, which would involve a right to object to drilling at places not agreed upon by himself, then this provision as to drilling within 300 feet of the buildings is idle and useless. We are bound to so construe this instrument as to, if possible, give effect to all its parts and provisions. To our mind this provision, taken in connection with that as to the location of wells, indicates clearly the intention of the parties that both should agree upon the location of the four required wells, but that the lessee alone should determine the location of any additional wells, subject to the restriction that they should not be located nearer to the buildings than 300 feet.

This lease also contains a provision in the written part to which I have called attention, "second party is also to protect the lines." A construction has been put upon similar language in oil leases by the courts, viz.: That if necessary to the protection of this tract, in order that the lessor may receive his share of the oil supposed to be underlying the district of which it is a part, the lessee shall drill additional wells. We can hardly conceive that with respect to that obligation which is imposed upon the lessee, the lessor would undertake to deter him from doing that which would be for the special advantage of the lessor, by adding a provision that when he came to drill those additional wells necessary for the protection of the lines he should pay $150 to the lessor on account of

each one of those wells. And yet that would follow from an adoption of the construction of this lease argued on behalf of the defendant in error.

After a careful consideration of what must naturally have affected the minds of the parties when they sat down to prepare this lease, we are led to the conclusion that the lessor did not intend nor desire that any stipulation should be contained in this lease which would deter the lessee from fully and promptly developing and producing the oil underlying his land. Therefore we are unanimously of the opinion that the meaning of this language as it is written and as it was intended is, that $150 of location money should be paid each for the four wells only. This conclusion brings us to a reversal of the court below.

*King & Tracy*, for plaintiff in error.

*Campbell*, *O'Farrell* and *Beard & Beard*, for defendant in error.